HARTMAN v INSURANCE COMPANY OF NORTH AMERICA

Docket No. 46299. Submitted June 19, 1980, at Lansing.—Decided
    June 3, 1981. Leave to appeal applied for.

William Prince, a mentally incompetent adult, was seriously and
    permanently injured in a collision between an automobile and
    the bicycle Prince was riding. Prince had been committed to
    the care of the state at an early age by petition of his mother
    and at the time of the accident he was living at a private group
    living facility owned and operated by Edward and Mary Baum-
    garten pursuant to a contract with the Center for Human
    Development, a state agency. Insurance Company of North
    America (INA) was the no-fault insurer of automobiles owned
    by the Baumgartens and Frankenmuth Mutual Insurance Com-
    pany was the no-fault insurer of the automobile involved in the
    collision. John Hartman was appointed guardian for Prince and
    he filed suit on behalf of William Prince in Bay Circuit Court,
    seeking no-fault insurance benefits from INA and Franken-
    muth. Both insurers denied liability. The State of Michigan
    intervened in the action, claiming a right of subrogation to any
    right of recovery Prince might have for the costs of medical
    services provided through the state's Medicaid program. A
    bench trial resulted in judgment in favor of plaintiff against

REFERENCES FOR POINTS IN HEADNOTES

[1] 7 Am Jur 2d (Rev), Automobile Insurance §§ 354, 355.
    Who is "member" or "resident" of same "family" or "household",
    within no-fault or uninsured motorist provisions of motor vehicle
    insurance policy. 96 ALR3d 804.
    Who is "resident" or "member" of same "family" as named insured,
    within liability insurance provisions defining additional insureds.
    93 ALR3d 420.
[2] 43 Am Jur 2d, Insurance §§ 271, 272.
[3] 43 Am Jur 2d, Insurance § 265.
[4, 5] 43 Am Jur 2d, Insurance § 315.
[6] 73 Am Jur 2d, Statutes §§ 385-387.
[7, 8] 7 Am Jur 2d (Rev), Attorney General § 9.
[9, 10] 73 Am Jur 2d, Subrogation § 122.
[11] 59 Am Jur 2d, Parties §§ 131, 132.
[12] 36 Am Jur 2d, Forfeitures and Penalties § 6.
    45 Am Jur 2d, Interest and Usury §§ 337, 338.

INA for $20,112.29, with interest through February, 1979, and in favor of the state against INA for $32,408.03, with interest calculated from April 1, 1977, through March 31, 1979, Eugene C. Penzien, J. No damages were assessed against Frankenmuth. INA appeals and Frankenmuth cross-appeals. *Held:*

1. Under the no-fault automobile insurance act, a bicyclist injured in a motor vehicle accident must first look to his own insurer if he has one. If he does not have one, he looks then to the insurer of a relative domiciled in the same household. It is only when there is no policy issued to anyone in his household that the statute permits the bicyclist to claim benefits from the insurer of the owner or driver of the motor vehicle involved in the accident.

2. Under all the facts and circumstances of this case, Prince was a "ward" of the Baumgartens and is, therefore, entitled to coverage under the terms of the INA policy.

3. Prince meets the criteria used to determine whether a person is a resident of an insured's household. He is therefore considered to be a resident of the Baumgarten household pursuant to the contract of insurance between INA and Edward Baumgarten.

4. Neither the plaintiff's suit nor the intervention by the state was barred by the one-year no-fault statute of limitations. The suit by Prince's guardian was timely because of the insanity saving provision of the Revised Judicature Act and the state has the authority to intervene as of right at any stage of any proceeding where necessary to protect any right or interest of the state or of the people of the state. The state also has the statutory authority to be subrogated to any right of recovery which a medically indigent individual may have for medical expenses, not to exceed the amount of funds expended by the state for the individual's care.

5. The trial court did not err by awarding plaintiff and the state-intervenor interest on their respective money judgments at the rate of 6% per annum from the date of the filing of plaintiff's complaint or by awarding additional interest at the rate of 12% per annum on each judgment from 30 days after the filing of plaintiff's complaint.

Affirmed.

1. INSURANCE — NO-FAULT INSURANCE — BICYCLES — MULTIPLE INSURERS.

A bicyclist injured in a motor vehicle accident must first look to his own insurer if he has one, and if he does not, then to the insurer of a relative domiciled in the same household; it is only

when there is no policy issued to anyone in his household that the no-fault insurance statute permits him to claim benefits from the insurer of the owner or driver of the motor vehicle involved in the accident (MCL 500.3114; MSA 24.13114).

2. INSURANCE — JUDICIAL CONSTRUCTION.

Language in an insurance policy is to be strictly construed against the insurer.

3. INSURANCE — JUDICIAL CONSTRUCTION — CONTRACTS.

The terms of an insurance policy must be construed in accordance with the ordinary and popular sense of the language used, so as to avoid strained interpretations.

4. INSURANCE — WORDS AND PHRASES — DOMICILE — RESIDENCE.

The terms "resident" of an insured's household or "domiciled" in the same household as an insured have no absolute meaning; the legal meaning of these terms must be viewed only in the context of the numerous factual settings possible.

5. INSURANCE — WORDS AND PHRASES — DOMICILE — RESIDENCE.

The factors to be considered in determining whether a claimant is a "resident" of an insured's household or "domiciled in the same household" include: (1) the subjective or declared intent of the claimant to remain, either permanently or for an indefinite time in the household; (2) the formality of the relationship between the claimant and the members of the household; (3) whether the claimant lives in the same house, within the same curtilage, or upon the same premises as the insured; and (4) whether the claimant has another place of lodging.

6. LIMITATION OF ACTIONS — SAVING CLAUSES — REVISED JUDICATURE ACT — STATUTES.

The general saving provisions of the Revised Judicature Act apply to causes of action created by Michigan statutes as well as causes brought under common law (MCL 600.5851; MSA 27A.5851).

7. ATTORNEY GENERAL — INTERVENTION — STATUTES.

The Attorney General has the authority to intervene in and appear for the people of the State of Michigan in any court or tribunal in any cause or matter, civil or criminal, in which the people of the State of Michigan may be a party or interested (MCL 14.28; MSA 3.181).

8. ATTORNEY GENERAL — INTERVENTION — STATUTES.

The authority of the Attorney General to intervene in any action

in any court of the state whenever necessary to protect any right or interest of the state or of the people of the state exists at any stage of the proceeding and the Attorney General has the same right as any other party to the litigation to prosecute an appeal, or to apply for a rehearing or to take any other appropriate action (MCL 14.101; MSA 3.211).

9. STATE — SUBROGATION — MEDICAL EXPENSES — STATUTES.

The state has a right of subrogation to any right of recovery which a medically indigent individual may have for medical expenses; this right of subrogation is limited to the amount of funds expended by the state for the patient's care (MCL 400.106; MSA 16.490[16]).

10. STATE — SUBROGATION — MEDICAL EXPENSES — INTERVENTION — STATUTES.

The state has the authority to enforce its right of subrogation to a medically indigent individual's right of recovery for medical expenses by intervening or joining in an action or proceeding brought against a party who may be liable for the injury (MCL 400.106; MSA 16.490[16]).

11. ACTIONS — INTERVENTION — STATUTES — COURT RULES.

Unconditional intervention of right granted by a statute is not subject to the discretion of the court and there is no requirement that such intervention of right be timely made (GCR 1963, 209.1[1]).

12. INTEREST — PENALTY INTEREST — JUDGMENT INTEREST — STATUTES.

A trial court may properly award 12 percent penalty interest and six percent judgment interest in the same action because the purpose of the six percent interest statute is to compensate the prevailing party for the expenses incurred in bringing an action and for the delay in receiving money, while the purpose of the 12 percent interest provision is to penalize the recalcitrant insurer rather than compensate the claimant; these statutes are not mutually exclusive (MCL 500.3142, 600.6013; MSA 24.13142, 27A.6013).

*Seward, Tally & Piggott, P.C.,* for Hartman.

*Smith & Brooker, P.C.* (by *Harry P. Gill),* for Insurance Company of North America.

*Purcell, Tunison & Cline, P.C.,* for Frankenmuth Mutual Insurance Company.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Janis Meija* and *James D. Clarke,* Assistants Attorney General, for the Attorney General.

Before: M. F. CAVANAGH, P.J., and D. E. HOLBROOK, JR., and J. H. PIERCEY,* JJ.

J. H. PIERCEY, J. This case stems from the June 2, 1974, collision between an automobile insured by defendant Frankenmuth Mutual Insurance Company (Frankenmuth) and a bicycle operated by William Prince, a mentally incompetent adult who was seriously and permanently injured in the accident. At the time of the mishap, Prince, who had been committed to the care of the state at an early age by petition of his mother, was living at a private group living facility owned by Mary Baumgarten and operated for profit by her and her husband, Edward Baumgarten, pursuant to a contract with the Center for Human Development, a state agency. Defendant Insurance Company of North America (INA) was the no-fault insurer of automobiles owned by the Baumgartens at the time of the accident.

A guardian was appointed for Prince on October 8, 1976, and suit was filed on March 2, 1977, seeking no-fault benefits from INA and Frankenmuth, both of which denied liability. The state intervened on June 26, 1978, averring that Prince had incurred no costs for those medical services paid for by the state and claiming that the state was subrogated to any right of recovery Prince might have for the costs of medical services pro-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

vided through the state's Medicaid program. A bench trial resulted in judgment on July 9, 1979, in favor of plaintiff against INA for $20,112.29, together with interest through February, 1979, and in favor of the state against INA for $32,408.03, together with interest calculated from April 1, 1977, through March 31, 1979. No damages were assessed against Frankenmuth. INA now appeals, and Frankenmuth cross-appeals.

I. *Which defendant is primarily responsible to William Prince for payment of personal protection insurance benefits under the no-fault act?*

Assuming *arguendo* that personal protection insurance benefits under the no-fault act would be payable to Prince under either of the two insurance policies involved in this action, it is necessary to determine which defendant has priority in the sense of bearing primary responsibility toward the injured party.

In resolving a similar problem, the Michigan Supreme Court in *Underhill v Safeco Ins Co,* 407 Mich 175, 182; 284 NW2d 463 (1979), stated:

"3) A motorcyclist injured in a motor vehicle accident must first look to his own insurer if he has one. If he does not, he looks then to the insurer of a relative domiciled in the same household. It is only when there is no policy issued to anyone in his household that the statute permits him to claim benefits from the insurer of the owner or driver of the motor vehicle involved in the accident."

A careful reading of *Underhill* compels the conclusion that it is as applicable to bicyclists as to motorcyclists on the issue of priority among insurers.

The *Underhill* Court concluded:

"The Legislature might have structured a no-fault act around the involved vehicle and such an act might make more sense to some people. It followed, however, the approach of most states and of the uniform act to make the owner's or family member's insurer primary.

"We conclude that the owner's or family member's insurer is primary and that there may be resort to the insurer of the involved vehicle only when neither the injured person nor a family member in whose household he is domiciled is insured." (Footnotes omitted.) 407 Mich 175, 192.

It is clear that in the case at bar Prince himself owned no policy of automobile insurance. According to *Underhill,* it is therefore necessary first to analyze the language of INA's no-fault policy with the Baumgartens to determine whether any coverage exists in favor of Prince as "a relative domiciled in the same household". *Underhill, supra,* 182. If so, INA is primarily and exclusively liable for no-fault personal protection insurance benefits. Recourse to Frankenmuth's policy covering the involved vehicle is proper only if a careful analysis of INA's policy discloses no coverage for Prince by INA.

II. *Was William Prince a "ward" of the Baumgartens at the time of the accident, as that term is used in INA's no-fault policy with its insured, Edward Baumgarten?*

Defendant INA's insurance policy with Edward Baumgarten at the time of the accident provided in pertinent part:

"SECTION I

"PERSONAL PROTECTION INSURANCE BENEFITS

"The Company will pay, in accordance with Chapter 31 of the Michigan Insurance Code, to or on behalf of each

eligible injured person or his dependent survivors, personal protection benefits consisting of:

"(a) allowable expenses,

"(b) work loss, and

"(c) survivors' loss

"as a result of bodily injury caused by accident and arising out of the ownership, operation, maintenance or use, including loading or unloading, of a motor vehicle as a motor vehicle.

\* \* \*

"DEFINITIONS

"When used in reference to this insurance:

"\* \* \* 'eligible injured person' means:

"(a) the Named Insured or any relative who sustains bodily injury in an accident involving a motor vehicle;

"\* \* \* 'relative' means a person related to the Named Insured by blood, marriage or adoption (including a ward or foster child) who is a resident of the same household as the Named Insured \* \* \*."

It is apparent that in order to recover under this policy Prince, at the time of the accident, must have been an "eligible injured person", which is further defined as a "relative", including a "ward", of the named insured. Thus, if Prince was a "ward" he was a "relative" and therefore an "eligible injured person" under the policy. The trial judge specifically found that William Prince was a "ward" of the Baumgartens as that term is used in the INA insurance policy, and we agree.

In reviewing the trial court's finding, it should be noted that "language in an insurance policy is to be strictly construed against the insurer". *Nickerson v Citizens Mutual Ins Co,* 393 Mich 324, 330; 224 NW2d 896 (1975). Policy language "must be construed in accordance with the ordinary and popular sense of the language used, so as to avoid

strained interpretations". *Cora v Patterson,* 55 Mich App 298, 300; 222 NW2d 221 (1974).

It is obvious that the term "ward" as used in INA's policy should not be restricted in its definition to include only a person on behalf of whom a legal guardian has been appointed by a court of competent jurisdiction. Rather, a common and ordinary dictionary definition of "ward", offered by *Webster's Third New International Dictionary (1965),* p 2575, is "a person * * * under the protection or tutelage of a person". It is therefore necessary to examine the factual context of the case at bar to determine whether William Prince was a "ward" of the Baumgartens as that word is used in common parlance.

The Center for Human Development contracted with Mrs. Baumgarten for the basic care of individuals placed with her by the Center. Mrs. Baumgarten testified that she considered the "Baumgarten Homes" as a business. At the time of the accident, Baumgarten Homes was caring for 19 men in two buildings, with six paid employees in addition to Mr. and Mrs. Baumgarten. Although her contract with the Center for Human Development required her to provide room, board, supervision, and certain skill training to the men, Mrs. Baumgarten did not consider them to be part of her family. She was not expected to buy clothing for them, provide them with medical care, or to maintain insurance for their benefit. On the other hand, the residents came to the Baumgartens for advice and called them "mom" and "dad". The Baumgartens took the men on occasional outings and had Christmas parties for them. Mrs. Baumgarten saw to it that the residents bathed, shaved, and changed their clothes; she also administered medicine to Prince as necessary.

Prince's social worker at the time of the accident testified that Prince was placed in the Baumgarten Homes to put him in an atmosphere where he would experience some of the attributes of living with other people in a less restricted setting and could experience as close a relationship to a family as was possible under the circumstances.

We hold that under all of the facts and circumstances of this case Prince was a "ward" of the Baumgartens according to the common and ordinary meaning of that term. In accord with this conclusion is the fact that although INA's agent had actual knowledge at the time he sold the insurance policy to the Baumgartens that they were engaged in the business of caring for handicapped people, and although this knowledge is imputable to INA via the existing agency relationship, INA never undertook to clarify the terminology of its policy—including the term "ward"—notwithstanding its potential risk exposure due to the nature of the Baumgartens' business. Any ambiguity in the policy must therefore be strictly construed against INA.

III. *Was William Prince, at the time of the accident, "a resident of the same household as the named insured", Edward Baumgarten, as specified in the policy of automobile insurance issued by INA?*

In addition to his having been a "ward" and therefore a "relative" of the named insured at the time of the accident, William Prince must also have been "a resident of the same household as the named insured" in order to qualify for personal protection insurance benefits under INA's insurance policy with Edward Baumgarten. We concur with the trial court's conclusion that Prince was a "resident" of the Baumgarten household.

The standard for determining whether one is a "resident" of an insured's household has recently been enunciated in *Workman v Detroit Automobile Inter-Ins Exchange,* 404 Mich 477, 495-497; 274 NW2d 373 (1979), as follows:

"Our review of both Michigan opinions and opinions of our sister state courts first reveals the general principle that the terms 'resident' of an insured's 'household' or, to the same effect, 'domiciled in the same household' as an insured, have 'no absolute meaning', and that their meaning 'may vary according to the circumstances'. *Cal-Farm Ins Co v Boisseranc,* 151 Cal App 2d 775, 781; 312 P2d 401, 404 (1957). The 'legal meaning' of these terms must be viewed flexibly, 'only within the context of the numerous factual settings possible'. *Montgomery v Hawkeye Security Ins Co,* 52 Mich App 457, 461; 217 NW2d 449 (1974).

"Accordingly, both our courts and our sister state courts, in determining whether a person is a 'resident' of an insured's 'household' or, to the same analytical effect, 'domiciled in the same household' as an insured, have articulated a number of factors relevant to this determination. In considering these factors, no one factor is, in itself determinative; instead, each factor must be balanced and weighed with the other. Among the relevant factors are the following: (1) the subjective or declared intent of the person of remaining, either permanently or for an indefinite or unlimited length of time, in the place he contends is his 'domicile' or 'household' * * *; (2) the formality or informality of the relationship between the person and the members of the household * * *; (3) whether the place where the person lives is in the same house, within the same curtilage or upon the same premises * * *; (4) the existence of another place of lodging by the person alleging 'residence' or 'domicile' in the household * * *." (Footnotes omitted.)

Application of the first *Workman* factor to the instant facts discloses no meaningful subjective or

declared intent on the part of William Prince to remain in the Baumgarten Homes, for the obvious reason that Prince, being mentally incompetent, could not form an intent which would be efficacious in determining his future place of domicile. Rather, this decision was vested in the Center for Human Development which had originally placed Prince with the Baumgartens pursuant to contract. We note that Prince's social worker testified that at the time of the accident there was no plan to move Prince from the Baumgarten Homes and stated that the Center for Human Development did not put a time limit on a person living in a care facility such as Baumgarten Homes. It thus appears that, as far as the Center was concerned, Prince was to be left with the Baumgartens for an indefinite period.

*Workman's* second factor, the formality or informality of the relationship between the person and the members of the household, operates in favor of a finding of residency under the present facts. Mrs. Baumgarten testified that she got along well with Prince and that he was very happy in the Baumgarten Homes. Even though the Baumgartens themselves had separate living quarters on the premises and dined alone, the occupants of the homes were free to knock on the door of the Baumgartens' quarters and then enter to discuss problems they might have. In addition, the Baumgartens arranged fishing and bowling outings for the men and gave Christmas parties for them. The occupants cut the lawn and shoveled snow at the homes and referred to the Baumgartens as "mom" and "dad". This evidence indicates a friendly and relatively informal atmosphere prevailing at the Baumgarten Homes and thus supports the conclusion that Prince was a "resident" there.

Thirdly, it is clear that the place where William Prince lived at the time of the accident was "upon the same premises" as that of the insured. The fact that the Baumgartens had separate living quarters for themselves in the Baumgarten Homes does not negate the essential fact that both they and the men for whom they cared occupied the same house. This fact also indicates that Prince was a "resident" of the insured's household.

Finally, the evidence in the case at bar fails to disclose "the existence of another place of lodging by the person alleging 'residence' or 'domicile' in the household". If Prince was not a resident of the Baumgarten household, he was not a resident anywhere. The trial judge correctly concluded that Prince was "a resident of the same household as the named insured" pursuant to the contract of insurance between INA and Edward Baumgarten.

IV. *Was plaintiff's suit or the suit by the state-intervenor barred by the one-year no-fault statute of limitations?*

The accident in which William Prince was injured occurred on June 2, 1974. A guardian was appointed for Prince on October 8, 1976, and suit was commenced by the guardian on March 2, 1977. The initial question to be resolved in light of these facts is whether plaintiff's suit was barred by the one-year no-fault statute of limitations set forth in MCL 500.3145(1); MSA 24.13145(1).

It is undisputed that William Prince was mentally incompetent at all relevant times prior to and following the accident. Michigan law is clear that the general saving provisions of the Revised Judicature Act, MCL 600.5851; MSA 27A.5851, apply to causes of action created by Michigan statutes. The insanity saving provision in the Revised Judicature Act thus extends the time during

which plaintiff could bring suit on behalf of William Prince under the no-fault automobile insurance act. See *Lambert v Calhoun,* 394 Mich 179; 229 NW2d 332 (1975), *Rawlins v Aetna Casualty & Surety Co,* 92 Mich App 268; 284 NW2d 782 (1979). The suit by Prince's guardian was therefore timely notwithstanding the one-year statute of limitations in the no-fault act.

We next examine the propriety of the trial court's action in allowing the state-intervenor to recover sums expended for Prince's care from the date of the accident. Although the state's complaint was not filed until June 26, 1978, the recovery permitted was nonetheless proper under Michigan law.

MCL 14.28; MSA 3.181 designates the Attorney General to "intervene in and appear for the people of this state in any * * * court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested". MCL 14.101; MSA 3.211 provides:

"The attorney general of the state is hereby authorized and empowered to intervene in any action heretofore or hereafter commenced in any court of the state whenever such intervention is necessary in order to protect any right or interest of the state, or of the people of the state. Such right of intervention shall exist at any stage of the proceeding, and the attorney general shall have the same right to prosecute an appeal, or to apply for a re-hearing or to take any other action or step whatsoever that is had or possessed by any of the parties to such litigation."

MCL 400.106; MSA 16.490(16) provides that the state shall be subrogated to any right of recovery which a patient may have for medical expenses, not to exceed the amount of funds expended by the state for the patient's care. The statute also em-

powers the state to enforce its subrogation right by intervening or joining in an action or proceeding brought by, *inter alia,* the patient's guardian.

It is important to analyze these statutes in light of GCR 1963, 209.1, which states:

"Intervention of Right. Anyone shall be permitted to intervene in an action

"(1) when a statute of this state confers an unconditional right to intervene * * *".

In distinguishing permissive intervention from intervention of right, the authors of 1 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 620 note:

"Sub-rule 209.1, governing intervention of right, does not contain the same qualifying phrase that application for intervention must be 'timely'. In this it differs from Federal Rule 24, which requires timely application for intervention, whether permissive or of right. Since Federal Rule 24 is cited as a source for Rule 209 in the Committee Notes, *supra,* it must be concluded that the change of wording to drop the word 'timely' in the Michigan rule was intended. In situations where intervention is of right, the would-be intervenor's interest in the proceeding is such that he will likely be seriously harmed if he is not permitted to intervene. Therefore, his right to intervene should not be overridden as untimely, even though an application for intervention might be denied if the intervention were merely permissive.

\* \* \*

"Sub-rule 209.1 provides for intervention as a matter of right in four situations:

"(1) Intervention of right is permitted when a statute confers an unconditional right to intervene. Statutes which extend a right to intervene have been collected under 'Statutory Provisions,' *supra.* If the language of the particular statute places no condition upon the

right of intervention and is not itself merely permissive, a party coming under the statute has standing to intervene of right under sub-rule 209.1, which is to say, that his intervention is not subject to the discretion of the court."

These same authors, at page 618 of their above-cited work, list MCL 14.28; MSA 3.181 as a statute granting intervention *of right* to the Attorney General under GCR 1963, 209. Also instructive are the authors' comments appearing at pages 294-295 of the 1980 cumulative supplement to that volume:

"However, as noted above, any restrictions on participation would normally not apply to an intervenor of right. It would be meaningless to give to a party an absolute right to intervene in order to protect his interest, if once in the case he were prevented from raising questions necessary for his own protection."

Careful consideration of the above-cited statutes and court rule compels the conclusion that the state's intervention in the present action was of right and therefore need not have been "timely" in terms of the one-year statute of limitations in the no-fault insurance act. Since the state's intervention in this case was not required to be "timely" and since restrictions on participation are normally inapplicable to an intervenor of right, logic compels the conclusion that upon intervention in the present action the state's right to recover monies expended by it for Prince's care as a result of the accident related back to the date of the accident. To hold otherwise would be effectively to deny the state full participatory rights, in direct contravention of the letter and spirit of the statutes and court rule discussed above. The trial judge therefore properly allowed the state to re-

cover sums expended by it for Prince's care due to the accident, commencing with the date of the accident on June 2, 1974.

V. *Did the trial court err by awarding plaintiff and the state-intervenor interest on their respective judgment amounts at the rate of 6% per annum from the date of the filing of plaintiff's complaint, in addition to interest at the rate of 12% per annum on overdue personal protection insurance benefits from 30 days after the date of filing of plaintiff's complaint, for an effective rate of interest on the judgments of 18%?*

The trial judge in the case at bar awarded plaintiff and the state-intervenor interest on their respective money judgments at the rate of 6% per annum from the date of the filing of plaintiff's complaint on March 2, 1977, pursuant to MCL 600.6013; MSA 27A.6013, and additionally awarded interest at the rate of 12% per annum on each judgment from 30 days after the filing of plaintiff's complaint, pursuant to MCL 500.3142; MSA 24.13142. Defendants contend that the cumulation or "stacking" of these two separate interest rates to yield a total effective interest rate of 18% per annum on the money judgments was improper.

In *Wood v Detroit Automobile Inter-Ins Exchange,* 99 Mich App 701, 709; 299 NW2d 370 (1980), this Court addressed the present question as follows:

"Finally, defendant claims that the trial court erred in awarding six percent judgment interest, MCL 600.6013; MSA 27A.6013, in addition to the 12 percent penalty interest under the no-fault act, MCL 500.3142; MSA 24.13142. The trial court awarded the 12 percent interest on the overdue wage loss payment from the time it became overdue. The six percent interest was ordered on the entire judgment from the date the

complaint was filed. Defendant contends that the overlapping of the interest provisions was impermissible.

"The purpose of the six percent interest statute is to *compensate* the prevailing party for the expenses incurred in bringing an action and for the delay in receiving money damages. *Schwartz v Piper Aircraft Corp,* 90 Mich App 324, 326; 282 NW2d 306 (1979), *Waldrop v Rodery,* 34 Mich App 1, 4; 190 NW2d 691 (197[1]). The 12 percent interest provision is intended to *penalize* the recalcitrant insurer rather than compensate the claimant. See *O J Enterprises, Inc v Ins Co of North America,* 96 Mich App 271; 292 NW2d 207 (1980) (similar purpose intended under the Insurance Code, MCL 500.2006; MSA 24.12006). We do not consider these statutes to be mutually exclusive. Therefore, the trial court correctly ordered both the six percent and the 12 percent interest." (Emphasis by the Court.)

We concur with the rationale of the *Wood* decision and affirm the interest awards in the instant case.

Affirmed. Costs to plaintiff.